IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HAROLD D. SALMONS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 10-811-GMS |

## MEMORANDUM

**I.   INTRODUCTION**

On September 23, 2010, the plaintiff, Harold D. Salmons ("Salmons"), filed this action against the Defendant Michael J. Astrue, Commissioner of Social Security,[1] for review of the final decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) application under Titles II and XVI of the Social Security Act. (D.I. 2; D.I. 15, at 5.) Salmons brought this civil action under 42 U.S.C. §405(g) as incorporated by 42 U.S.C. §1383(c)(3). (*Id.*)

Salmons initially applied for disability and disability insurance benefits on August 30, 2007. (D.I. 17 at 116–26.) Salmons' claims were denied initially and on reconsideration. Subsequently, claimant filed a request to have a hearing before an Administrative Law Judge ("ALJ"). (D.I. 17 at 6–7.) The claimant appeared and testified before the ALJ on May 7, 2009

---

[1] Carolyn W. Colvin became the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") on February 13, 2013, after briefing began. Although, under FED. R. CIV. P. 25, Carolyn W. Colvin should be substituted for Michael J. Astrue, pursuant to 42 U.S.C. § 405(g), no further action is necessary to continue this action.

before ALJ Melvin D. Benitz ("ALJ"). (D.I. 17 at 21-68.) On August 19, 2009, the ALJ issued an unfavorable decision against claimant. (*Id.* at 8-20.) The Appeals Council denied review on August 4, 2010 and the ALJ's determination became final. 20 C.F.R. §§404.955, 404.981, 416.1455, 416.1481 (2012); *Sims v. Apfel*, 530 U.S. 103,107 (2000); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).

Before the court is Salmons' motion for summary judgment and defendant's cross-motion for summary judgment. (D.I. 15; D.I. 19.) For the reasons that follow, the court will deny Salmons' motion and grant defendant's cross-motion. The court will affirm the decisions of the Administrative Law Judge ("ALJ") and the Appeals Council. The court's reasoning follows.

## II. BACKGROUND

### A. Salmons' Medical Records

Salmons submitted medical records in support of his DIB and SSI applications. These medical records document several different medical issues including: cardiovascular issues, degenerative disc disease, depression, and numbness in his left hand.

#### 1. Hand Injury and Raynaud's Phenomenon

Salmons suffered an injury to his left hand on December 3, 2003, as a result of an approximately 30lb steering knuckle falling on him. (D.I. 17 at 232.) The external injuries were minor and characterized as a "mild contusion," but, as a result, Salmons experienced cold intolerance and numbness in his index and long finger since the accident. (*Id.*) After visiting Dr. Nappi on December 16, 2003, Salmons was diagnosed with Raynaud's phenomenon. (*Id.*) He saw Dr. Nappi once per month and in June 2004, he was approved to return to work with no restrictions; however he continued to see Dr. Nappi every month. (*Id.* at 226, 235.) He continued to experience the Raynaud's symptoms, especially when it was colder. (*Id.* at 223–24.) In May

2005, Salmons was evaluated for workers' compensation and was continuing to experience pain, swelling, decreased motion, and discoloration of the fingers when the temperature fell below 70 degrees. (*Id.* at 624.)

2. **Cardiovascular Issues**

On August 10, 2007, Salmons was hospitalized for a myocardial infarction and coronary artery disease. (*Id.* at 243–46, 268–77.) He was treated and discharged from the hospital in stable condition. (*Id.* at 276–77.) In November 2007, Salmons visited the hospital again for chest pain and also for numbness in his left arm and face. (*Id.* at 311–15, 320–22, 465–67.) His EKG and other testing done revealed no new myocardial infarction, but an x-ray of his cervical spine showed degenerative disc disease at C6/C7 with posterior spurs. (*Id.* at 466–67, 469.) Salmons again sought emergency room treatment for chest pain and numbness on his left side in February 2008. (*Id.* at 379–80, 383–90, 440.) His pain was "completely resolved" with medication and all testing results came back normal. (*Id.* at 383.)

Salmons also sought the care of Dr. Altajar from October 2007 until April 2008 for his occasional complaints of chest pain and numbness on the left side. (*Id.* at 304–06, 328–30, 440–45, 497–99, 500–07.) The initial physical exam was generally normal, except that the left hand was cold. (*Id.* at 305–06.) A further test on Salmons' heart rhythm showed no problems. (*Id.* at 333.) During the rest of the examinations that Dr. Altajar conducted on Salmons from December through April there were normal physical findings including: cardiovascular, musculoskeletal, and neurological. (*See id.* at 328–29, 441–45, 501–02, 504–05.) No other coldness or stiffness in the left hand were observed. (*Id.*) A second heart catheterization showed improvement and Salmons' medicine regimen was continued. (*Id.*)

3

Salmons was also treated at the Community Care Family Clinic several times. (*Id.* at 342–46, 427–28, 519–20.) This clinic diagnosed Salmons with neuropathy of his left upper extremity and a thyroid nodule. (*Id.* at 427.) In May 2008, Salmons developed pain in his left arm after a golf outing and visited the Community Care Family Clinic. (*Id.* at 519.)

In April 2008, Salmons' file was reviewed by State agency medical consultant Dr. Holifield who found that Salmons retained the physical capacity to perform full range of light work. (*Id.* at 509–16.) In August 2008, he was examined by State agency medical consultant Dr. Ponterio who came to the same conclusion. (*Id.* at 548–55.)

Dr. Adili-Khams treated plaintiff from August until October 2008 for several of his medical issues including; tobacco use, depression, hearing loss, back pain, left hand numbness, pain in the left arm, and hyperlipedmia. (*Id.* at 586–87, 590–92.)

Dr. Oliveira, a cardiologist, saw Salmons between September 2008 and March 2009. (*Id.* at 588–89, 593–96.) Dr. Oliveira determined through cardiac testing that Salmons' heart function had improved greatly since August 2007 and was in fact completely normal. (*Id.*) No more chest pain was reported and his coronary artery disease was reported as stable. (*Id.* at 593.)

### 3. Degenerative Disc Disease and Back Pain

Dr. Thomas, a neurologist, saw Salmons between September 2008 and February 2009 for his left side numbness. (*Id.* at 564–75.) Salmons' neurological examinations were found to be normal. (*Id.* at 565–66, 568–69, 571–72, 575–76.) Dr. Thomas ordered an EMG of Salmons' left arm in October 2008 which showed mild chronic cervical polyradiculopathy. (*Id.* at 576.) A MRI of Salmons' spine in September 2008 was positive for degenerative spondylosis at the C6/C7 level, with neural foraminal stenosis. (*Id.* at 578.) In November 2008, an MRI of the lumbar spine showed degenerative disc disease with canal narrowing and evidence of herniation at the L5/S1

4

level. (*Id.* at 579–80.) Dr. Thomas diagnosed Salmons with lumbar disc disease, cervical and lumber radiculopathy, and other conditions relating to his prior cardiac problems. (*Id.* at 569, 572, 575.)

Upon referral from Dr. Thomas, Dr. Sabbagh, an orthopedic surgeon, examined Salmons. (*Id.* at 572, 610.) Dr. Sabbagh also diagnosed Salmons with degenerative disc disease at the L5-SI and L4-5 with herniation at L5-S1. (*Id.* at 610.) He recommended pain management surgery for Salmons. (*Id.*) Salmons returned to Dr. Sabbagh in April 2009 and said that he wanted to have the surgery. (*Id.* at 609.) In April 2009, Dr. Thomas supported Salmons' disability claim and indicated that he would be unable to work based on back issues, more specifically his lumber impairment. (*Id.* at 613–18.)

### B. Hearing Testimony

#### 1. Salmons' Testimony

On May 7, 2009 Salmons testified that he last worked in 2004. (D.I. 17 at 24.) He testified that he experienced a hand injury while working as a mechanic which required surgery and rehabilitation. (*Id.* at 25.) Salmons further testified that although he was medically cleared to return to work, his hand did not function well enough to complete his previous job. (*Id.*) Since his injury, he has experienced numbness and swelling in his hand, especially in the colder weather. (*Id.* at 27.) Salmons has also claimed to have hearing loss which inhibits his ability to engage in conversation, especially in public. (*Id.* at 29.) Salmons asserts that he has a herniated disc in his lower back which is very painful and has since been diagnosed as degenerative disc disease. (*Id.* at 31.) Salmons also claims to be receiving medical attention for depression. (*Id.* at 35.)

Salmons moved to Florida in 2005 for two years because of the warmer weather. (*Id.* at 37–39.) Since the onset of his disability, Salmons has not been able to drive and so his daughter

5

cannot live with him any longer. (*Id.*) Salmons is able to cook, clean, and care for himself and his daughter. (*Id.*)

### 2. Vocational Expert's Testimony

An independent vocational expert ("VE"), testified that Salmons could return to light-duty work. (D.I. 17 at 55.) The VE also stated that the position of general inspector and final inspector would fit under her description of work that Salmons is able to perform. (*Id.*) The VE estimated that for the job of general inspector, there were 2,060 locally and 204,100 jobs nationally. (*Id.* at 56.) The VE also estimated that for the job of final inspector, there were 1,220 jobs locally and 190,300 jobs nationally. (*Id.*) The VE also explained that these particular jobs could be performed with the use of one hand because they did not require manipulation and would require only the ability to push a button. (*Id.* at 60–61, 63.) The VE testified that if an individual could not work in temperatures under 75 degrees, it would preclude employment, but that the use of a glove on the afflicted hand to prevent problems with the cold would not impact employment. (*Id.* at 59–60.)

### C. The ALJ's Findings

The ALJ conducted the standard five-step procedure to determine whether plaintiff was disabled. His findings may be summarized as follows:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2009.
2. Plaintiff has not engaged in substantial gainful activity since August 10, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
3. Plaintiff has the following severe impairments: degenerative disc disease at L5-S1, Raynaud's disease, and depression (20 CFR 404.1520(c) and 416.920(c)).
4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526 and 416.926).
5. Plaintiff has the residual capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he must be able to alternate between standing and sitting every thirty

6

minutes during an eight hour workday five days a week. He must avoid hazardous machinery and heights. Plaintiff will have some hearing difficulty and must have work that involves little reading and writing. He is limited to work involving low stress, low concentration, and low memory. Plaintiff is limited to work that can be performed with one hand.

6. Plaintiff is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Plaintiff was born on March 11, 1959 and was 48 years old, which is defined as a younger individual 18-49, on the alleged disability onset date. (20 CFR 404. 1563 and 416.963).

8. Plaintiff has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform (20 CFR 404.1569, 404.1569(a), and 416.969(a)).

11. Plaintiff has not been under a disability, as defined by the Social Security Act, form August 10, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 17 at 13–19.)

### III. STANDARD OF REVIEW

A district court's review of the Commissioner's decision is limited to whether that decision is supported by substantial evidence. *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988)); *see also* 42 U.S.C. § 405(g). If the decision is supported by substantial evidence, then the court is bound by the factual findings therein. *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); 5 U.S.C. § 706(E); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Substantial evidence has been defined as less than a preponderance, but "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389,

401 (1971)). "Overall this test is deferential, and we grant similar deference to agency inferences from fact if those inferences are supported by substantial evidence, even where this court acting de novo might have reached a different result." *Monsour Med. Ctr.*, 806 F.2d at 1190. Furthermore, "the evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Id.*

Thus, "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion. *Id.* Where, for example, countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain or mental disability, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). Despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

A court may grant a motion for summary judgment if it "determine[s] that 'there is no genuine issue as to any material fact' and that the movant is entitled to judgment as a matter of law." *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56 (c)). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is

8

material only if it might affect the outcome of the suit under the applicable rule of law. *Id.* In its determination, the court must review the record as a whole, "drawing all reasonable inferences in favor of the nonmoving party, but it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The threshold inquiry is whether there are any "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250; *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 329–30 (3d Cir. 1995) (same).

The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions. *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment,

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). "The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

The court has jurisdiction under 42 U.S.C. § 405(g)(2010).

IV. **DISCUSSION**

After considering the record, the parties' submissions and arguments, and the applicable law, the court finds the ALJ's decision is supported by substantial evidence.

    A. **The ALJ's Credibility Determination**

The ALJ is the factfinder and credibility determinations are the ALJ's job alone; further, the district court may only disturb the determinations of the ALJ if they are not supported by

substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *2 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). The ALJ is entitled to reject evidence, but must explain why that evidence has been rejected. *Cotter v. Harris*, 642 F.2d 700, 705–06 (3d. Cir. 1981). Where conflicting evidence is presented, an ALJ may only reject a medical opinion of the claimant's treating physician where the contradicting evidence provides more substantiation or supporting explanation. *Plummer*, 186 F.3d at 429. The treating physician's opinion may not be rejected because of the ALJ's own credibility judgments, speculation, or lay opinion. *Id.*

Salmons argues that the VE's hypothetical was incorrect because it did not include all of the limitations that were established by Salmons. (D. I. 15 at 8.) Defendant asserts that substantial evidence supports the ALJ's determination. (D.I. 19 at 20–21.)

In the present circumstances, there is substantial evidence to support the ALJ's credibility determinations. Salmons' testimony about his own limitations was not entirely credible. The ALJ pointed out that Salmons' medical records show that "he is not as sedentary as he alleged in his testimony." (D.I. 17 at 18.) The medical evidence showed that he injured his left arm while playing golf in May of 2008 and that he helped his sister clean the yard in October of 2008. (*Id.*) The ALJ noted that even though the impairments that have been determined could be reasonably expected to cause some of the allege symptoms, the "intensity, persistence, and limiting effects of these symptoms are not credible" because they conflict with the capacity assessment. (*Id.*) The ALJ also considered the medical opinions of Dr. Padrell and Dr. Thomas who stated that Salmons was unable to work. The ALJ found that their determinations were not supported by their medical examinations. (*Id.*) The ALJ determined that the treating physicians's findings were not supported by the actual examinations they performed. (*Id.*) During the assessment of Salmons' physical and

mental capacities, the ALJ weighed the treating physician's determinations. (*Id.*) The ALJ correctly and adequately considered the evidence provided in the record.

### B. The ALJ's Disability Determination

Salmons asserts that the ALJ's decision is flawed based on two separate grounds. (D.I. 15, at 8.) First, Salmons alleges that he is disabled under the Commissioner's Medical-Vocational Rules. (*Id.*) Second, Salmons alleges that VE's hypothetical did not include all of Salmons' established limitations. (*Id.*) The defendant argues that the ALJ properly characterized the claimant's residual functional capacity ("RFC") as light work. (*Id.* at 17.) Both parties have agreed that Salmons has not engaged in substantial gainful activity since August 10, 2007. (*Id.* at 13.)

The ALJ must follow the SSA's five-step sequential evaluation process to determine whether a claimant suffers from a physical or mental disability. *Fraser v. Astrue*, 373 F. App'x 222, 224 (3d Cir. 2010). In the determination, the ALJ must consider: (1) the claimant's current work activity; (2) the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether he or she can "make an adjustment to other work in the national economy." *Id.* (citing 20 C.F.R. §404.1520(a)(4)(i)-(v)). The claimant bears the burden of proof on steps one through four. *Id.* While the Commissioner bears the burden of proof at step five. *Id.*

11

### 1. Step One

At step one, the ALJ must determine the claimant's current work activity, more specifically, whether the claimant is engaged in substantial gainful activity. In this case, the parties both agree that the claimant has not engaged in substantial gainful activity since August 10, 2007.

### 2. Step Two

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c); 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. When assessing the severity of a combination of impairments, the ALJ must "consider the combined effect of all of the impairments separately." 20 C.F.R. §§404.1523; 416.923.

Here, the ALJ found that Salmons did in fact have several "severe" impairments including: degenerative disc disease, Raynaud's disease, and depression (20 CFR 404.1520(c) and 416.920(c)). The ALJ based findings these on the medical evidence that was established by Salmons including an MRI from November 2008, the history of Raynaud's disease, and his psychiatrist's diagnosis of depression. (D.I. 17 at 13.)

The ALJ found that the medical evidence showed that Salmons possesses several "non-severe" impairments including; a hearing deficiency and coronary artery disease. (*Id.*) The ALJ explained that although Salmons was diagnosed with a hearing deficiency in August of 2008 that he did not have difficulty hearing during normal conversation and none of his medical sources noted any difficulty hearing. (*Id.*) Further, the ALJ noted that Salmons' coronary artery disease is stable and in fact his ejection fraction was completely normal. (*Id.*)

### 3. Step Three

At step three, the ALJ must determine whether the claimant's impairments or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR § 404, Subpart P, app. 1. 20 C.F.R. §404.1520(d), 404.1525, 404.1526, 416.925, and 416.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the durational requirement, the claimant is disabled. If it does not, the analysis proceeds to the next step. An impairment matches a listing if it meets all of the specified medical criteria; an impairment that manifests only some of these criteria, no matter how severe, does not qualify. *See Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

Here, the ALJ determined that Salmons does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (D.I. 17 at 14.) The ALJ considered the listings in 1.02(B), 1.04 and 11.04. (*Id.*) The ALJ correctly determined that Salmons does not have an inability to perform fine or gross motor movements, neurological deficits, and does not have sensory or motor aphasia resulting in ineffective speech.

The ALJ also correctly considered the listing criteria of 12.04 which must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. The ALJ found that Salmons was able to maintain his own household and care for personal needs. (D.I. 17. at 14.) Salmons is able to maintain a relationship with immediate family and exhibits socially acceptable behavior. (*Id.*) Concerning episodes of decompensation, the claimant has experienced no episodes of decompensation of extended duration. (*Id.*)

### 4. Step Four

In step four, the ALJ determined that the claimant is unable to perform past relevant work as an auto mechanic. The ALJ determined that Salmons' past relevant work was heavy and skilled work. Substantial evidence supports this determination.

### 5. Step Five

At step five, the ALJ determines if there is a significant number of jobs in the national economy for individuals with the claimant's age, education, work experience, and residual functional capacity. 20 C.F.R. §§ 404.1520(g) and 416.920(g). In establishing the claimant's RFC, the ALJ must pose a hypothetical which accurately conveys all of the claimant's established limitations to an independent vocational expert. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). During step five, a portion of the burden shifts to the Social Security Administration because it is responsible for providing evidence that demonstrates what other work exists in significant numbers in the national economy that claimant can perform.

Here, the ALJ correctly determined Salmons' RFC as able to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). It is important to note that the ALJ did not state that Salmons could perform a full or unrestricted range of light work. Rather, the ALJ found that Salmons could lift up to ten pounds frequently and twenty pounds on occasion, which was consistent with light work. (D.I. 17 at 15.) Further, the ALJ found that Salmons needed to alternate between standing and sitting every thirty minutes during an eight-hour workday. (*Id.*) Based on the testimony of the VE, the ALJ concluded that considering Salmons' age, education, work experience, and RFC that he is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (*Id.* at 19.) The ALJ considered Salmons' established limitations including: degenerative disc disease, depression, and Raynaud's disease.

Salmons claims that the hypothetical offered to the VE did not include all of his established limitations. Salmons insists that he cannot work in temperatures lower than seventy-five degrees and that if this environmental limitation were presented to the VE, the VE would likely concede he would be precluded from work. (D.I. 15 at 12.) Salmons relies on "objective observations" of his physicians. (*Id.*) To the contrary, the court finds that these claims are overstated and not objectively found in the record. Dr. Nappi stated that Salmons was "progressing well" and that he could return to "light duty" work. (*See* D.I. 17 at 228, 230.) Further, other examinations do not include references to support the assertion of "extreme discomfort." (*Id.* at 305, 622.) In addition, the VE testified that an individual could use a glove to prevent problems with the cold such that employment was not impaired by Salmons' seventy-five degree temperature limitation. To the extent that Salmons is limited in the use of his left hand, the fact that the ALJ limited his hypothetical to the VE to work that could be performed with one hand sufficiently accounted for any such limitation. (*Id.* at 15, 55–56.)

The testimony of the VE confirmed to the ALJ that Salmons could perform a range of light duty work and that these jobs are relatively plentiful in the local and national economy.[2] (*Id.* at 19.) The VE determined that Salmons could perform work as a "final inspector" which exists in 1,220 local and 190,300 national jobs; general inspector which accounts for 2,060 local and

---

[2] Salmons asserts that the ALJ should not have consulted a VE, but should have instead utilized Rule 201.10 which provides a grid for sedentary work. (D.I. 15 at 5, 7.) The court concludes that the ALJ properly relied upon VE testimony as a result of Salmons' exertional and nonexertional limitations. Additionally, because the ALJ did not find Salmons limited to sedentary work he was not required to apply the grid rules. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). The grids may function as guidance for decision-making where a claimant's RFC is not listed in the grids and are to be used as a framework for adjudicating claims where an individual's RFC falls between ranges of work. *See* SSR 83-12, 1983 WL 31253. The court finds substantial support for the ALJ's decision to consult a VE in both the Agency regulations and Third Circuit case law. *See* 20 C.F.R. §§ 404.1566(3), 416.966(3); *see also* SSR 83-12, 1983 WL 31253, at *2 ("Where the extent of the erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource."); *Boone v. Barnhart*, 353 F.3d 203, 210 (3d Cir. 2004) (a "VE can provide a more individualized analysis as to what jobs the claimant can and cannot perform than does [an ALJ's] determination of the claimant's occupational base") (citing SSR 83-12).

200,100 national jobs; and collator operator which provides 1,160 local and 240,800 national jobs. (*Id.*) The court concludes that the VE provided a reasonable explanation for why the occupations identified could indeed be performed at the light level with Salmons' functional limitations.

The ALJ did not err by failing to include the claimed additional limitations. Moreover, the hypothetical provided by the ALJ to the VE was accurate and reflected Salmons' established limitations. Accordingly, substantial evidence supports the ALJ's assessment of Salmons' restrictions resulting in the proper finding that Salmons' functional limitations are consistent with a limited range of light work.

## V. CONCLUSION

For the foregoing reasons, Salmons' motion for summary judgment is denied and the defendant's motion for summary judgment is granted.

Dated: March 2, 2015

UNITED STATES DISTRICT COURT